Good morning, Your Honors. Ben Cimino on behalf of the Eliker plaintiffs. I'd like to reserve three minutes for rebuttal, if I may. Are you guys splitting time? Unfortunately, yes. We decided I would take 12, my friend would take 8. Thank you, Your Honors. Two facts in this case are undisputed. First, it's undisputed that Nichols never provided Brown's plane with four miles of radar separation from the FedEx 757. And second, it's undisputed that four miles of radar separation would have prevented this crash. Despite those undisputed facts, the district court put zero liability on the controllers in this case. And it did so for two reasons. First, it concluded that controllers had no duty to provide radar separation. And second, it found that Brown's negligence was a superseding cause of the crash. Both of those are questions of law. Both of those were wrong, and this court should reverse. Turning first to that duty question, a controller's duties are dictated by the ATC manual. And the manual requires that in Class C airspace, small planes be given four miles of separation behind any 757s. The only exception to that is Section 7-2-1 of the manual, which allows controllers to terminate radar separation if they explicitly instruct the pilot to, quote, maintain visual separation, and the pilot accepts that instruction. It's undisputed that that never happened here. And therefore, Nichols had the duty to provide Brown's plane with four miles of separation behind the FedEx 757. Are you arguing for a rule of basically strict compliance with the ATC manual? We are not, Your Honor. The reason we're not is because what this leaves open, our position is if there were some sort of justification for a failure to provide radar separation, such as an emergency that required the controller's attention elsewhere, the government could have presented that evidence and could have said, look, we understand that this duty exists, but this duty is subject to extenuating circumstances. They didn't do that here. In fact, the record shows that within, I think, weeks, if not days of the accident, the NTSB interviewed Nichols and asked him, you know, you had these two options. You didn't do either. What was your justification? And he offered zero justification. Is it your position if Mr. Nichols had said, per the manual, maintain visual separation, the accident wouldn't have occurred? Slight clarification there, a caveat to that. If he had said those words and Brown had accepted that explicitly, then our position is that Nichols would not have had the responsibility to provide radar separation. That's correct. I guess... Pretty clear that the court is saying there is no negligence, per se, for a failure to follow that manual. But what is the standard of care? And did the court properly set out the standard of care owed by Nichols? Yeah, I think the district court bought into my friend's sort of characterization of this as a strict liability or negligence, per se, situation, and it's not. We're not, for the reasons that I just gave a moment ago to Judge Bress, which is we're not here to say that the government is handcuffed and must always provide this separation when it applies if they have some other situation that dictates control or attention elsewhere. We leave room for that, but there's no evidence of that here. Instead, this case was fought really on duty grounds. They took the position that we didn't have a duty to provide that separation. And more specifically, Your Honor, they took that position because they said, well, look, Brown was flying under VFR, visual flight rules. He saw his traffic, so the district court found, and therefore, there was nothing else to do with radar separation. He had an obligation to avoid the traffic, and he didn't do it, and that's it. And it just doesn't work that way because that is an either-or proposition that the manuals expressly foreclose in this circumstance. They give a concurrent duty until it's terminated under 7-2-1. They give a concurrent duty to both parties, the controller to provide radar separation and the pilot to use their eyes to avoid traffic. And it's that redundancy, that concurrent duty, which is thought to best promote air safety, and that's what didn't apply here. As I mentioned a moment ago, the government's position really is that controllers can unilaterally terminate radar separation and don't have to follow 7-2-1. I mean, it seems like the district court's point was that what the air traffic controller did was reasonable in the totality of the circumstances, that even though he didn't say maintain visual separation and get a confirmation, he did warn about wake turbulence and identify these planes. I know there's a dispute of whether they saw the UPS or FedEx, but assuming the district court's findings are correct, that he essentially put the pilot on notice, did something reasonable, or what a reasonable air traffic controller would do. I mean, what's your response to that? My response to that is that's a slippery slope that becomes a very dangerous slope. I mean, we need bright lines in aviation to promote safety. We need bright lines to instruct pilots and tell them exactly when they do and do not have the benefit of radar separation. And the notion that a controller can withdraw this affirmative obligation, because again, under the manual, the default setting is that radar separation must be provided. The manual could have very easily been written to say, controllers, provide radar separation when you think it's needed, when you look at the circumstances and you think that the pilot needs it, then provide it. But it doesn't say that. It says you have to provide it unless this exchange occurs. And it's very explicit about that. But it seems like when you say it that way, it does start to sound a little more like negligence per se. It's not negligence per se to say that controllers have this duty and that unless they can come up with a justification for failure to do it, it is negligence if they fail to do so. That's how I've always understood negligence per se, that you say, look, here's the standard of care. You deviated from that. And unless you can provide a justification for your deviation, you're negligent. That's how I've understood that. We're not saying that in every case where this duty applies and a controller fails to do it, it's automatic negligence. They have the opportunity to bring in some sort of reason why they didn't do that. But that reason can't be, I didn't think the pilot needed it because the pilot was visually flying and the pilot saw the traffic and that was the end of it. Because that essentially is a circular reason that just removes this whole concept from the rule book. It would just, and I would invite my friend when they get up here in a moment to provide you with the circumstance in which there would ever be a duty to provide radar separation if all that it took was to say, well, the pilot was flying VFR, everything looked okay, therefore I didn't think the pilot needed it. I mean, there's more than that here. You know, I mean, I think that sort of understates the other side's defense on this, but I think that same question can be flipped around to you, to your side to say, well, under what circumstances are you going to say that noncompliance with the ATC is going to be non-negligent? I think in a circumstance where you have an affirmative duty under the manual to provide radar separation, I admit there won't be a lot of circumstances where a controller's going to constitute negligence. I think that's a fair characterization, but this court's precedents demonstrate that one example is where there's an emergency or there's something else that takes the controller's attention elsewhere. And on that, I mean, it doesn't – Right, but then we're not, then we think we're talking maybe on the same terms. We're just asking kind of what are the set of facts that are going to justify not following the manual? And your view is that that's going to be a pretty narrow set of facts. It involves like an emergency or some kind of dire situation, and the government would say, well, no, it involves sort of a broader set of facts and circumstances. That seemed to be where the district court was on this. And the trouble with that is, Your Honor, those facts are going to exist in virtually every case. And so if – and there's a second problem with it besides it being sort of commonplace, if not every case, which is the ambiguity inherent in that. I mean, part of the function of this provision is to have the conversation between the pilot and the controller, so we're very clear that radar separation is not – that safety net is not being provided. And if controllers can just look at the picture and just say, I think the pilot's got it, and quietly to themselves decide, I'm not going to provide radar separation, that's a very ambiguous circumstance. What's the interplay here between state law, Nevada state law, which I think on the FTCA they say we should look at tort laws, state – tort law of the state, and the federal guidance here, the ATC manuals, which, you know, I think we've said, you know, these generally guidance manuals that don't go through notice and comment process, they're not binding law. They're just kind of guidance. How do we balance this kind of state tort law, which says totality of circumstances, and then we kind of have this overlay of this ATC manual, which isn't binding as law? I mean, how do we balance these two? What's the interplay between the two? Sure. It's a great question, Your Honor. And my answer is this. I think we are in a dangerous place when we start to say that provisions of the manual do and don't apply in certain states. I mean, the purpose here is to have a clear standard that applies from sea to shining sea. I mean, this is a heavily regulated industry. We need pilots to know when I'm in this airspace versus that airspace, the rules are the same. We cannot have them between federal, how we characterize the manual, and state law is a little bit overblown in my friend's position, because it really comes down to this concept of negligence per se. And I want to be very clear. We're not saying that a violation of the manual always results in liability for the controllers. We're not saying that. And even in states where it would constitute negligence per se, that opportunity provided justification comes in. I mean, this is not a situation where you have to decide that Nevada law controls. Although I would say, you know, it would present an interesting preemption issue if the manual said that pilots, I'm sorry, controllers have to do X, and state law suggested that they could do Y. I mean, that seems to me to be a classic preemption situation. So I think that this Court's precedents are clear, that the manual is what sets the duties and responsibilities of controllers. Now, whether or not they violated those is a circumstantial inquiry. But their argument essentially reduces to, we didn't have the duty. And that's in conflict with the manual, just straight up. And apart from the ambiguities that it would entail, I also want to emphasize, this is a record where, I mean, the evidence is actually really, really strong and consistent that you have to strictly comply with 7-2-1 in order to terminate the duty to provide radar separation. I mean, that's not just us. Obviously, we have our experts. But that was their experts. Turner, their ATC expert, said so. Nickel conceded the point. You have the evidence that the FAA, within days of this incident, issued a bulletin to the Tower that said, hey, we mean it when we say, you have to say, maintain visual separation or you have to provide radar separation. There's no, you know, loosey-goosey, well, we thought it was okay, so we didn't do it. It's an either-or. You had the NTSB and their findings. You even had the Tower retrain Nickel afterwards and emphasize that same, this is a fork in the road. You've got to go this way or you go that way. So it's actually really, really consistent on this point. Is there a different standard of care after the collision warnings came out? I mean, we're analyzing this on the transfer of responsibility, but what happened after those collision warnings were produced and then what should Ellicott have done then? You're referencing those alarms that went off in the Tower, Your Honor? Yeah, so that happened very late. I want to emphasize in the last minute of this incident, and I'm not suggesting that the standard of care should have necessarily changed. Really, our position is that there should have been something done earlier in this flight, although we do think that that is still an opportunity for Nickel to have given some instruction to Brown to let him know that, hey, you know, you're getting close and perhaps you want to go around. I mean, give him some information at that point to help him safely finish this flight. It seems like the analysis of the district court is focused on the experience of Brown as a pilot and as somebody who was recognized by the FAA as being very skilled. Was that proper under the circumstances? I don't think it was proper because the controller, I don't know how the controller would have known that at the time. I don't know that the controller can look and say, oh, well, we got Brown up there. He's good. I can go smoke a cigarette or something. Because there's no evidence in the record to support that conclusion. I don't believe there is, and I don't think we want controllers doing that and tailoring their instructions based on the person in the cockpit. And before I forget, I do want to go back to one point about this concept of the government's position that, well, it looked like everything was okay and Brown had it and he saw the traffic, et cetera, so I didn't need to provide radar separation. Another problem with that position is it really conflates a controller's duties in these two worlds that exist. In the management activities case, which is the government's favorite case, I think they cite it like two dozen times in their brief, that really shows you this fork in the road and how this works. When you have an affirmative obligation to provide radar separation, you have that affirmative obligation. You must provide it. That ceases when you have this conversation with the pilot where you say maintain visual separation or I think in the context of an IFR pilot, it's a visual approach clearance. And after that, the controller can sit back and do nothing until they are confronted with facts or circumstances that they perceive, hey, this pilot needs some guidance. And that's replete throughout management activities. It's also this circuit's precedence that, let's see, the Hamilton case this court's decision at 497 Federal Seconds 370, pages 375 through 376. And that is the circumstance where the controllers then have to do exactly what Nickel purports to have done here where they look and say everything looked fine to me. I didn't need to do anything. Or conversely, gee, I saw some stuff that looked concerning and so I intervened. They want to conflate that and do away with this. Counselor, just watch your clock because you're eating up into your co-counsel's time. Oh, well then I apologize and I will see you on rebuttal. Thank you. May it please the court, Austin Sweet on behalf of the Brown family, I would like to reserve two minutes of rebuttal. Your Honor, I want to start by addressing some of the court's questions. First of all, the conversation about negligence per se and strict liability. And you mentioned, Judge Lee, the issue of the statement of caution-wake turbulence. The United States throughout their briefing, and I think the district court relied on this as well, misunderstood and I believe the difference between the caution-wake turbulence warning and the words maintain visual separation. And I think that's very important. When we're talking about strict liability, when the district courts throughout various decisions cited in the United States brief talk about caution-wake turbulence, that is a warning. That is a warning that is discretionary to the controllers that is given when the controller feels it is necessary and appropriate. But the words maintain visual separation are an instruction. And that is part of the transfer of the duty from controller-applied radar separation to pilot-applied visual separation. And those words are necessary and mandatory as part of the transfer of that duty. It is an instruction to the pilot to maintain visual separation and it is telling the pilot that the controller is no longer providing radar separation. And of course the pilot can say no. The pilot does not have to accept that instruction. And so by saying maintain visual separation and waiting for the pilot to acknowledge, there is a handoff of that duty, of that responsibility to maintain wake turbulence separation. And that's different from the advisory of caution-wake turbulence. That is an advisory that does not change any party's duties. And the reason that's important is if you're talking about strict liability or negligence per se, the cases cited by the United States say that providing a caution-wake turbulence warning does not necessarily create negligence. If the controller should have said caution-wake turbulence but didn't, that didn't cause the crash because the pilot already knew that he was supposed to look at that aircraft and avoid its wake turbulence. That's different than the transfer of duty for wake turbulence separation with the words maintain visual separation. Because until the controller tells the pilot maintain visual separation and until the pilot agrees to do so, the pilot has every basis to believe that he is being provided four miles in this case of wake turbulence separation and he has no reason to know or where the district court erred is the affirmative finding that Mr. Brown saw FedEx 1359. According to the district court, Mr. Brown's, excuse me, the district court understood Mr. Brown's final words. Mr. Brown's final words were that he had a visual on the airliner for the right. And as discussed in our brief, what he meant, and all parties agreed to trial, was I have a visual on the airliner that is landing on runway 16 right. And at the time there were two airliners landing on 16 right. Throughout the decision by the district court, the district court repeatedly stated that Mr. Brown said he had a visual on an airliner to his right or on his right or off to his right. That is not what Mr. Brown said. And that misunderstanding of the evidence permeated throughout the decision and resulted in the district court believing that Mr. Brown affirmatively saw FedEx and not the UPS. And based upon that decision, the district court found that Mr. Brown had that affirmative duty to now that he had seen the correct airplane, he had the duty, regardless of what Mr. Nickel had done to put him in the situation he was in, to safely extract himself from that situation and land his aircraft. We have to give some deference to the district court's finding, factual finding, that the pilot saw the FedEx and the UPS. And I take your point that he said for the right, to the right, maybe referring to the runway. But there's some countervailing evidence that maybe he did see the FedEx, not the UPS, because the UPS was close to landing on the runway already. And given that, don't we have to give deference to the district court here in this factual finding? Some of the findings, sure. But the particular finding as to what he said and where he was looking when he said he had a visual on the aircraft, it is flat wrong compared to the undisputed evidence. And that finding permeates all the other findings. The district court refers back to that belief that Mr. Brown said he had a visual on an aircraft to his right. That keeps coming up in the order. It's cited over and over and over again. Every time the district court makes another finding as to why it believes Mr. Brown saw the FedEx, not the UPS, it refers back to the aircraft on his right. Let me ask you, let's imagine that he had clearly said, I see the aircraft to my right and we weren't having this discussion about this particular factual issue. Would there still be, would you still say that the air traffic controller breached a legal duty at that point? Your Honor, the problem is it depends, the answer is yes. And what we need to analyze is when did he see the aircraft and what could he have done at that time? Because the problem is the physics of it, he was already not provided four miles of separation. Because remember, the way these aircraft are converging on the airport, the duty to have provided four miles of separation has already been breached. And so at that point, of course, Mr. Brown had a duty if he saw the correct aircraft to avoid it. But what needed to have been analyzed, which the district court didn't do because we went past that, was at what point did he see it? What could he have done about it at that point? And was the comparative negligence between what the controller had done put him already in a situation where he was already too close to the FedEx aircraft, and compared to what Mr. Brown could and should have done to avoid the aircraft? What did the records show on this point about what, once he said, I have visual to the right, whether he could have done anything more to avert this? So there, of course, was no explanation or no decision as to had he seen an aircraft to the right, what he could or should have done differently. Was there expert testimony on this point? The expert testimony was that before this even happened, Mr. Nichols should have removed Mr. Brown from the landing pattern and had him circle around so that he would already be back behind the FedEx 1359 before he even got into that situation. Now, again, the testimony or the record showed that Mr. Brown saw an aircraft that was landing for the right, which one he saw was not specified in his transmission. And so there was no expert testimony as to if he had, in fact, said, I see an aircraft on my right, what he could have done differently at that point. But we don't know. And the problem is we're speculating as to what he meant and what he saw and what he could have done based upon the failure to communicate by the air traffic control. Is this governed in Nevada by a comparative negligence regime? Somebody could say, well, there was fault on both sides and then try to value, try to apportion that? Absolutely. And that's what we think should be done on remand. And I'll reserve the rest of my time unless there's further questions. You guys have exceeded your time, but I'll give you two minutes each. Thank you. May it please the Court. My name is Robert Gross, and I represent the United States of America in this case. We had eight days of trial. Judge Due heard the testimony of numerous experts, heard the testimony of Greg Nickel. Greg Nickel got off the witness stand, explained his observations, what he saw, what he believed, using a mock tower. Keep in mind that a controller in a tower has windows, and his primary responsibility is the runways, watching the runways, watching the taxiways. He has radar, but that's not his function. That's just an aid as compared to a TRACON, which Brown originally spoke with the TRACON, Approach Control. And a TRACON is in a room looking at a radar scope, a dark room. It's a totally different ballgame. She heard the testimony of the witnesses. She reviewed documents, many documents. And after all that, she concluded that Gregory Nickel, the air traffic controller that's alleged was, their alleging was negligent in this case. Originally, they were controllers, but their focus is on Nickel. She concluded that he was not negligent in no way caused or contributed to the accident, and that the sole and proximate cause of the crash was the negligence of Pilot Brown. Those findings of hers, those conclusions, are supported by abundant evidence in the record, and backed by, as I said, fact and expert testimony. She found the government's experts to be credible. She found Nickel to be particularly credible, and she found the plaintiff's experts to be not persuasive and not credible. And she mentioned that in her decision. So, it's our position that there's just no basis here for a reversal. Well, I mean, to what extent is credibility part of this? Because, you know, Nickel can credibly testify that, I believe, that the pilot had visual separation. That doesn't necessarily answer the question of whether he had a legal duty under the circumstances to say something more to the pilot, even though he may credibly explain why he did what he did. Well, let me explain that. So, Nickel explained, and the court found his explanation to be credible, that he believed that the pilot had accepted responsibility to provide his own visual separation. And the basis for that was, initially, the pilot was flying on a downwind leg away from the airport. He had already been told that there was a 757, it was told by the TRACON, 15 miles from the airport. Nickel had told the pilot to continue inbound on the downwind, and the pilot, on his own initiative, turned from the downwind to a base leg. It turned out to be a modified base, which we're calling a dog leg. But he made that turn by himself. His VFR is a perfectly clear day. I mean, perfectly clear. It's good visibility, more than 10 miles. All you need is three for VFR. The sun is up in the sky. He's flying under visual flight rules, and he makes that turn. That conveyed to Nickel, that was the expert testimony, that he did not want four miles of radar separation, because if he did, he would have continued on the downwind, as was explained, and put four miles behind the other three planes. There was an order of FedEx, then the UPS, and American. The court found that, you know, Nickel explained that he believed that the pilot would be listening to those transmissions, because that was his duty, and the court found that he would know their general positions and intentions. So, the pilot is essentially taking a shortcut. He's making that turn, and then he continues turning so that he's now on a dog leg. So, just so you know, two parallel runways, you have the FedEx, who's on a nine-mile final, and you have Brown, Pilot Brown, now turning on a dog leg. That's a 60-degree angle from the final. He's coming in on what we call a modified base, and then he turns and makes onto a close-in base, and then he turns onto final. When you come in like that, there was expert testimony on this, and Nickel said this, too, you're not expecting or wanting four miles of radar separation. So, the judge credited Nickel's testimony on that, and the testimony of the expert witnesses, that he did not want or expect four miles of radar separation. How far does this get us here? Because, I mean, I think he would say, well, I didn't know, you know, I wasn't told about the four miles, so I wasn't given the choice to accept it or reject it. Well, keep in mind, this is an experienced pilot who's based there, and owns a flight school, Flying Start Aero, the Cessna Pilot Center. He's been there for several years. It's an airport that has a mix of small planes and airliners coming in to land. The idea that he didn't know that he was not getting four miles of visual separation flies in the face of the evidence and is absurd. Of course he knew. The plaintiffs want this court and wanted the district court to believe that he didn't know he wasn't getting four miles. Remember, when he turned from the dogleg to the close-in base, he was a mile away from this FedEx that had just crossed in front of him. The idea that he didn't know the difference between one mile and four miles, there's a vast difference between those two amounts. Further, this idea that he saw the UPS, he reported the UPS that was landing, he saw that, but he didn't see the FedEx went across in front of him. Plus, the evidence shows that when he said he had a visual on the airliner for the right, that this airliner was obviously on his right. Even the plaintiff's experts conceded that when the pilot was told his traffic is a 757 on a nine-mile final, caution wake turbulence, this pilot wouldn't know where that is. He wouldn't know that these planes travel about three miles a minute. In a minute, that plane's going to go from nine miles to six miles. When the pilot said he had a visual on the airliner for the right, why would he be reporting a plane that was about to land? That wasn't his traffic. And the court found that Nickel had every reason to believe that he was reporting the right, the correct aircraft. Because for a plane to go from a nine-mile final, actually to now a half-mile final, you'd have to be going the speed of sound. Plus, that's how planes come in on approaches. So, the other thing is that when he reported having a visual, it was when the Bonanza, remember he was coming in on the downwind, and he made a descending turn. The FedEx is also descending. When they are exactly at the same altitude is when he reported the FedEx. And that's typical. The air traffic control expert said that was a typical scenario. And we had our own experts go out and fly in this area, and they could hardly, they could not see planes that were landing when they were a half-mile away from the airport because they were in ground clutter. The other thing is, you know, the ground control in Nickel told the 757 that the Bonanza on a four-mile base, left base, has you in sight. And then the FedEx said, we're looking. A plane that is about to land isn't going to be concerned about a plane that's four miles away. And so, Brown would know that. He would know that if he did make a mistake, and we don't think he did, the evidence showed that he didn't. And that's what the court found. I mean, are you really addressing the duty or negligence, or is this really more about proximate cause? Well, both. I mean, if you want to get, the court... Most of it seems to be proximate cause, that is, you know, pilot knew, should have known, didn't know. The controller passed the baton. This pilot knew, had to know, and it was reasonable for the controller to believe he knew, because based on his flight path, based on the fact that he was facing the 757 at all times, his rate of descent matched that of the 757. He turned toward the 757. All that indicated to the controller that he was maintaining visual separation. Plus, it was his duty to do that, and he had been warned earlier, caution awakes turbulence. So how do you, his duty at that point as a VFR pilot is to maintain visual separation from that plane. Can you step back here? Yeah. Just a broader legal issue. I had asked your friends on the other side, you know, how do we balance the state tort law and the federal guidance? And maybe this is just the future of the Federal Tort Claims Act, but it does seem a little bit weird to say we look at the state tort law of the state when we're talking about airplanes that cross, you know, multiple states repeatedly. I mean, I don't know if the, you know, if the tort law of the 50 states differs significantly, but yeah. Not when it comes to negligence. I mean, the standard is reasonableness under the circumstances in every state. So Court did her duty. She analyzed the state as she has to under the Federal Tort Claims Act. I mean, analyzed the case using Nevada tort law. That's what she did. Now, the Ninth Circuit has already said that the Air Traffic Control Manual is just evidence of, doesn't set the standard. Now, there's no preemption. Admiralty, that's a different story. There's preemption, federal, but not here. That's not how the FDCA works. So she found that given the totality of the circumstances, the controller's conduct is reasonable, and it was not foreseeable that at the last second, the pilot, who was, you know, coming in perpendicular to the FedEx now, perpendicular, right? That the pilot, the last second, here's the FedEx coming in. He crosses right to left. They're a mile apart, which is quite a distance a mile apart. Just when you're driving on the highway and it says exit one mile ahead, take a look at how long that is. You know, perfectly safe, normal, everything's normal at this point. The FedEx crosses in front of them. Now, the procedure is to note the flight path of the plane that you're following, stay above it, note its landing point, and then land beyond it. Then you won't get into the wake. What this pilot did was, as the plane passed him, this is the flight path. It's like a triangle, the hypotenuse of a triangle. This is the threat area. The plane is now here, but the threat area is here. This is the flight path. He was above that flight path. You can see that in the diagrams that are in the briefs. Then he made a descending left turn. Instead of just holding his altitude, for some reason, he started his descent and he dipped down last second into the wake. That's what caused the crash. The judge do correctly determine that there was no connection between the actual cause of the crash, which was pilot negligence, and any act or omission on the part of Nicol. She found that the negligence of the pilot was the sole and proximate cause of the crash. In other words, it was not that any act or omission on the part of Nicol was not even a factor, let alone a substantial factor in causing this accident. These are factual determinations she made. They're not clear error. There should be deference to the factual determinations that she made regarding proximate cause and also breach of duty. She found no breach of duty. Now, they're arguing what they argued at trial, but the district court addressed their arguments in her order denying the plaintiff's, in this case, Appellah's, post-trial motions for rehearing. One second. Here we go. So, with regard to the Elicker's, she said, and I'm reading from the record, page four of the ER, from her order, the Elicker party's argument that the court overlooked the fact that Nicol did not, say, maintain visual separation and the conclusions the Elicker party's wish followed from that omission, which is that the controller should have given him four miles of separation, is beyond unpersuasive. It is frustrating. The court simply was not persuaded by the Elicker party's theory of the case. Then she goes on to say the Elicker party's also attempt to factually distinguish some of the case law upon which the court relied in the bench order and missed the point in doing so. As the court explained in the bench order, the court reads these cases suggest that it may consider the context surrounding the air traffic controller's interactions with the pilot in determining whether the air traffic controller was negligent, which directly contradicts the Elicker party's theory of the case, that Nicol is essentially strictly liable for the plane crash because he did not, say, maintain visual separation in contravention of the air traffic control manual. That is true. He did not use the prescribed, he didn't use the magic words, you know, the prescribed phraseology. But there was a meeting of the minds. This pilot was not operating under the assumption that he was getting four miles. Assuming, as our expert pointed out, Turner, the requirement to provide four-mile separation arises only if you're not going to have visual separation. And Mr. Nicol testified, my job was to apply separation until separation was applied by the pilot. So that baton had been passed. There's no continuing duty to, you know, for the controller to all of a sudden tell the pilot, hey, stop what you're doing. The pilot in command, okay, to just override him and say, hey, stop what you're doing. I've got to give you four miles. These two were on the same page. They had a meeting of the minds. They were not, they were, no way that this pilot could have possibly believed that he was, he was not, that he was getting four miles. He was not expecting it. Now, in terms of control, concurrent duties, cases are pretty clear that concurrent duties aren't, isn't necessarily concurrent liability. Like the Spalding case, for example, where that phrase comes from. But the plainest, Ellicott's given an analogy where the two drivers pass through, like blow through stop signs at an intersection and, you know, they hit each other. And they use that analogy to show that there's concurrent responsibility here. But in that case, the analogy, the two drivers were expecting the other driver to stop. In this case, our case here, there was no expectation on the part of Brown that he would be getting four miles of separation. The evidence showed he didn't want four miles and that he continued, anyway, he continued knowing that he wasn't getting four miles. And from the time he said he has a visual to the time of the crash. And that's just like Spalding and other cases, black. But the judge didn't find there was necessarily, there was no superseding cause. You could find that here, that there was a superseding cause. She found that there was, that he acted reasonably, there's no nickel, no breach, and no causation. And to answer your question about pilot's experience, that went to the pilot recognition that he wasn't getting four miles. And also, there's no way that he didn't know that, a pilot of his experience. The controller doesn't know, like you said, the pilot's background. But he does know whoever's flying his high-performance plane into our airport, a high-performance plane has to be well-trained. Because it's not, you know, a SESTA 152 or 172, these small trainers. This is a high-performance plane with retractable gear. So, you know, he has certain expectations. He has the right to believe that this pilot is going to follow the federal aviation regulations and stay high, land long, and avoid a wake encounter. Great, thank you. Does anybody have any other further questions? No, we're done. Great, thank you. Thank you. Thank you, Your Honors. So just very quickly here, you heard it just a moment ago, this idea that the controller had no responsibility to provide wake turbulence separation because Brown was flying a pattern that brought him within four miles. I mean, effectively, that reduces to a premise that any time the controller observes a pilot flying within that amount of distance, that there's no obligation to provide radar separation, which would categorically deny radar separation in every single case where it's needed the most. The pilots who are four or more miles away from the aircraft in front of them don't need that radar separation, and those are the only people under the government's rule who would get it. That makes no sense. This notion that proximate cause here doesn't apply because it wasn't foreseeable to the controller, that Brown wouldn't execute this fly high, land long procedure, that fly high, land long procedure applies every single time you are following a wake producing aircraft on a parallel runway or on a single runway where you're in a queue. So this is the belt and suspenders approach that we're talking about. The government keeps wanting to reduce this to an either or, and it's not an either or. It's a belt and suspenders. So you get that separation, the requisite distance, and you fly high and land long. And when you do both, nobody dies. When someone drops the ball on one of those, crashes happen like it did here. And also the whole premise about not foreseeable, I mean, the manual says explicitly that the whole concept of redundancy, as I just described, is to prevent, to compensate in many cases for failures that may affect safety. So it's categorically foreseeable that mistakes are going to happen, and that's why we have these redundancies. Also, this notion, I do have to hit it because it's pernicious and it comes up. It was replete in the testimony, if you recall, Nichols' testimony, that he had responsibilities for the air traffic and the ground. That is just wrong, and you don't have to take my word for it. This is at 2 ER 167 where the government, at paragraphs 21 and 22, these are their proposed factual findings. They say that Nichols operated the local control and Eric Edney operated the ground control position, and then it says the duties of the GC and LC overlap, but the GC primarily handles the aircraft, that's the ground control, not Nichols, on the taxiways, while the local control primarily handles aircraft flying within Reno's Class C airspace. So this notion that he was trying to do two things at once is just wrong. His responsibility was to provide that separation. He didn't do it. This crash happened. This court should reverse and remand for allocation of fault and damages. Thank you. Thank you. Your Honors, my friend, on behalf of the government, repeatedly said that Mr. Nichols passed the baton. He didn't pass the baton. He dropped the baton, walked away, and assumed that Mr. Brown was going to pick it up, and that's not how the FAA regulations work. Safety protocols matter, especially when it comes to controlling air traffic. The FAA has spent decades building a system of rules and procedures to ensure air travel is safe for pilots and their passengers, and that system depends on clear, concise, reliable, verbal communications over the radio. That's why air traffic controllers use words like Niner and a phonetic alphabet to ensure clear, concise, reliable communications. The system does not work merely because we have rules in place. The system only works when those rules and procedures are actually implemented and followed. When the rules and procedures require the controller to pick up the radio and actually communicate with the pilot, it's not sufficient for the controller to simply look out the window and make assumptions as to what the pilot intends and wants. The district court here got it wrong when it found that Mr. Nichols was relieved of his duty to provide that four-mile of radar, controller-applied radar separation, despite not actually communicating that intention with Mr. Brown, and that decision should be reversed. Thank you. Thank you. Thank you all for the helpful argument. The case has been submitted, and we recess for the day.
judges: LEE, BRESS, Kane